**A. B. MORRISON, Petitioner,**

**v.**

**David L. JONES, Commissioner of Correction, Department of Social Rehabilitation and Control for the State of North Carolina, Respondent.**

**No. C–C–75–250.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

Feb. 9, 1977.

Robert F. Rush and Robert A. Karney, Charlotte, N. C., for petitioner.

Richard N. League, Asst. Atty. Gen., North Carolina Dept. of Correction, Raleigh, N. C., for respondent.

## ORDER

McMILLAN, District Judge.

## FINDINGS OF FACT

A. B. Morrison, a North Carolina state prisoner, seeks habeas corpus, alleging violation of his right under the Sixth Amendment to a speedy trial.

Petitioner and a friend and business acquaintance named George E. Cox were charged in the Superior Court of Mecklenburg County, North Carolina, with the crime of first-degree murder, allegedly committed on September 4, 1969. Cox and Morrison denied guilt. However, after several months in jail awaiting trial, the accused Cox turned state's evidence and arranged to testify against Morrison. He did so testify in both subsequent trials; his prosecution was nol prossed and was not, so far as the record shows, revived.

Morrison was tried twice.

The first trial was on February 19, 1970. It resulted in a mistrial because of a hung jury. Cox was the principal witness. His testimony tended to show the following:

Cox and Morrison worked for Connelly Home Improvement Company in Ashland, Kentucky. They and their wives were friends. Cox had a heart attack and moved back to Locust, North Carolina. In early September, 1969, pursuant to some telephone conversations, Morrison and his wife drove from Kentucky to North Carolina to meet Cox and talk about going back into business together, either in North Carolina or back in Kentucky with Connelly.

Ralph Gordon, the deceased, was a stranger to Morrison but a personal friend of Cox.. Gordon and Cox had known each other for six or seven years and had lived and worked together. They renewed close contacts when Cox returned to North Carolina.

Morrison and his brother and wife and children went to Cox's house. It was Labor Day weekend. The Morrisons and Cox and Gordon started drinking together and drank considerable amounts over a period of many hours. The three men then went to a river house owned by L. T. Smith and remained there drinking and playing cards from about 6:30 or 7:00 in the evening of September 3rd until about 11:00 P.M. They also had dinner, and did some singing. There was a dispute between Morrison and Gordon over a poker hand involving a pair of queens; there was no violence; the evidence showed that they compromised the issue by "splitting the pot," and played some more poker later on. Morrison won.

Morrison and Cox and the deceased, Gordon, left the Smith cabin, all fairly well intoxicated, about 11:00 P.M. or later, and headed east toward Locust, some thirty or forty miles away. They stopped at an Esso station in Charlotte at Tryon Street and Sugar Creek Road. Gordon got out of the car to call a friend or a taxi to complete the trip to his home. Cox further testified that a few minutes later Gordon re-joined the other two at a restaurant a short distance

away. The witness Cox said that he, being pretty drunk, went to sleep or "passed out." He was awakened by the sound of gunshots and looked around and saw that he was alone in the car in a church yard. Morrison got back in the car, without Gordon, and they drove home. On the way home, Cox said, Morrison told him that he had killed Gordon. Cox apparently did nothing about it and expressed only momentary surprise and disbelief. He said, in fact, that he did not believe it (T. p. 21).

Morrison and Cox drove with their families to Kentucky the next day, and spent the night in a motel near Morrison's Kentucky home. They were arrested September 6th when they went to Morrison's home, and were charged with first-degree murder.

In another version of Morrison's statements, Cox testified (T. p. 28) that Morrison told him, while they were in jail in Kentucky, that Gordon had attacked him with fists, had pulled a gun on him, and had actually fired at Morrison and that Morrison had taken the gun away from Gordon and killed him. He also testified to some threats which he said Morrison had made against him later in prison if he, Cox, "said anything about it."

Other witnesses testified about the various events at the Smith river house that night, but Cox was the only witness to any of the events that took place after Morrison and Cox and the deceased left the Smith house after 11:00 P.M.

There was no evidence that Morrison had a gun that night; there were no fingerprint or other marks; there was no physical evidence; the only evidence against Morrison (other than statements by police relating what Cox had said to them) was the testimony of Cox himself.

The jury was unable to agree upon a verdict, and on February 19, 1970, a mistrial was ordered. Morrison was released under a $7,500.00 bond.

Two years passed, with no effort by the state to re-try Morrison.

On January 20, 1972, the state took a nol pros with leave.

In December, 1972, the prosecution was revived and a new warrant was issued for petitioner's arrest. The sole basis for the re-activation of the case was said to be some new information voluntarily offered by telephone by a Kentucky man named Spencer. Spencer told the District Attorney that he had possession of a firearm which petitioner had told Spencer he had used to kill a man in North Carolina. Spencer delivered the firearm to police. Later on, *before the trial,* the District Attorney determined (1) that the weapon had not been sold to the original purchaser until *after* the murder, (2) that the police department's ballistics experts had examined the gun and concluded that it was *not* the murder weapon, and (3) that there was "relatively strong" bad feeling between Spencer and Morrison.

The testimony of Spencer, on whose volunteer information the petition to re-open was based, was thus determined to be false and unreliable. Nevertheless, the District Attorney decided to proceed to trial. Petitioner pleaded not guilty but was tried and convicted of second-degree murder at the April 16, 1973, term of Mecklenburg County Superior Court, and was sentenced to, and is serving, twenty years in prison.

Spencer was *not* called as a witness.

The evidence at the second trial covered substantially the same ground as that at the original trial, with three exceptions. These exceptions were the testimony of the witness Whitfield, the testimony of the witness Bryan, and the testimony of Morrison himself denying all guilt.

L. G. Whitfield was an attendant at the Esso station. He had been known as a witness by the prosecution at the first trial but had not been called to testify.

Whitfield testified at the second trial that on the night of the murder three men in a car stopped at his station and asked for directions to Locust, North Carolina, and that he saw the handle of a gun on the front seat of the car. (Cox's testimony had placed Morrison at the wheel, Cox in the right front seat, and Gordon in the back

seat at the time of the visit to the filling station.) Whitfield had given a statement to the police five weeks after the death, but had *not* mentioned a pistol. He could not identify Morrison or Cox except that petitioner Morrison "resembled" one of the men.

The prosecuting attorney at the second trial was a new man who had not conducted the first trial. He testified, in an effort to explain why Whitfield had not been called as a witness the first time, that

"*I was informed* that either he was in the hospital *or for some reason* he was not, he had not testified at the first trial. He was unavailable. *I don't know* whether *they* couldn't subpoena him or he was in the hospital."

This testimony falls far short of a competent showing that the witness Whitfield was in fact unavailable at the first trial, and it does not answer the question why, if due care had been taken to prepare the case for the first trial, it was not postponed as a routine matter upon motion or decision of the prosecutor.

Howard Bryan testified at the second trial. He had also been known to the prosecution at the time of the first trial, and the state on the first trial had elected not to offer his testimony. His testimony was that a week or so before Morrison came to North Carolina, Morrison had inquired where he could buy a pistol for the protection of his wife. Bryan knew where a pistol could be bought; they went and looked at it and tried it out; and Morrison bought the gun, a .38–caliber pistol of Spanish make, some twenty-five or thirty years old.

The third exception was that Morrison testified at the second trial and denied any guilt or knowledge of the crime, and offered witnesses to his good character. Morrison testified that he and Cox parted company with Gordon, the deceased, at the Esso station, and never saw him again. He also testified that he was purchasing food for Cox's family and was trying on the trip to North Carolina to help Cox get back on his feet financially.

The only new evidence of any consequence at the second trial was thus the circumstantial testimony of the witness Whitfield that he saw the handle of a gun on the front seat of a car containing a man who "resembled" Morrison.

## CONCLUSIONS OF LAW

The Sixth Amendment to the United States Constitution says:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . ."

This crime was committed on September 4, 1969, and petitioner was arrested on September 6, 1969. The first and unsuccessful prosecution ended February 19, 1970.

The accused was set free pending re-trial of his first-degree murder charge, on a bond of $7500.00. Without explanation, the prosecution went for two years doing nothing at all about the case. On January 20, 1972, a nol pros was taken. On December 13, 1972, an order was entered by Judge William T. Grist for re-trial of the case and for Morrison's arrest. The second trial itself occurred in April, 1973, and a conviction was rendered on April 16, 1973, more than three and one-half years after the original arrest.

The question is whether failure to provide a speedy trial entitles petitioner to a writ of habeas corpus.

Several factors must be considered. These are the length of delay; the reason for the delay; prejudice to the defendant; and whether defendant should be denied relief because he was not constantly clamoring at the prosecutor's door demanding re-trial. *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

On this record petitioner has satisfied all necessary requirements and is entitled to be released because he was denied a speedy trial on the murder charge. *Barker v. Wingo, supra; United States v. MacDonald,* 531 F.2d 196 (4th Cir. 1976).

1. *There was no speedy trial.*—The homicide occurred on September 4, 1969.

The first trial ended on February 19, 1970. The state took a nol pros on January 20, 1972, and it was not until December of 1972, more than three years after the original arrest, that the second prosecution was instituted. On the face of it, this is too long. Unless the constitutional requirement of speedy trial is to be stood on its head, this petitioner is entitled to relief.

If we take any account of the "evolving considerations of decency" in this field, it is worth noting that Congress has passed a law, the Speedy Trial Act, which sets sixty days as the time within which ordinarily [federal] reprosecution following a mistrial must be completed. 18 U.S.C. §§ 3161, et seq.

2. *No reason was given by the prosecution for the delay.*—The record is devoid of any reason for the delayed re-trial. Moreover, the reasons which prompted the new prosecution proved to be illusory. The witness Spencer and his "information" about a gun were the sole reason for the motion to re-open the case. Before the trial was started, Spencer's testimony was demonstrated to be false insofar as it connected Morrison with the gun or guns in question, and probably also to be motivated by personal ill will. Neither Spencer nor the weapon he produced was used at the re-trial. This leaves the decision to re-try hanging by one fragment of circumstantial testimony of the witness Whitfield who, on this record, is not shown to have been unavailable at the original trial.

3. *The defendant was prejudiced.*—If Whitfield had testified at the first trial, the testimony about the gun and his identification could have been challenged and tested by fresh memory and circumstances. Defendant lived for more than three years with the shadow of a possible re-trial hanging over his head. He was prejudiced by this, even though not in prison during that time. See *Klopfer v. North Carolina*, 386 U.S. 213, 222, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967); *United States v. MacDonald*, 531 F.2d 196 (4th Cir. 1976). Testimony three and one-half years old is far less precise and reliable than testimony given promptly after an event. "Loss of memory . . . is not always reflected in the record because what has been forgotten can rarely be shown." *Barker v. Wingo*, 407 U.S. 514, 532, 92 S.Ct. 2182, 2193, 33 L.Ed.2d 101 (1972).

4. *Defendant's failure to demand early re-trial should not bar relief.*—The duty to try and prove the case is that of the prosecution, not the defendant. The evidence shows no effort by Morrison to evade or delay re-trial at any time between the first trial in January, 1970, and the time the case was re-activated in December, 1972. In view of the length of the delay and the complete absence of excuse for it, other than weakness of the prosecution's case, defendant's passive failure to demand early re-trial is not fatal to his constitutional right.

IT IS THEREFORE ORDERED that the writ of habeas corpus issue and that petitioner be immediately released from custody. Respondent is directed to certify compliance with this order by February 15, 1977.